# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| DAVID BREWSTER, | ) | |
| | ) | Case No. 3:19-cv-484 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| SWAGGERTY SAUSAGE CO., INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION

Before the Court is Defendant Swaggerty Sausage Co., Inc.'s ("Swaggerty") partial motion to dismiss. (Doc. 7.) For the following reasons, Swaggerty's motion will be **GRANTED IN PART** and **DENIED IN PART**.

### I.    BACKGROUND

Plaintiff David Brewster is a former employee of Swaggerty, a business that makes sausages. (Doc. 1, at 3.) From April 2015, until his termination in December 2018, Brewster served as a maintenance technician. (*Id*.)

In 2018, Swaggerty was notified that it had to stop dumping waste in Johnny Creek. (*Id*.) Swaggerty responded by building a waste system, but it did not work properly. (*Id*.) As a result, Rick Gill, Swaggerty's director of maintenance, created samples of cleaned waste for submission to the "agency regulating water," while Swaggerty continued to dump waste "into a nearby creek." (*Id*.) Brewster told Gill that he believed it was illegal for the company to dump waste, including meat fat, gloves, and hairnets, and to then submit falsified samples. (*Id*.)

On September 23, 2018, Brewster notified John Burlingame, a day-shift supervisor, of a defective safety valve on the "Line 6 linker machine." (*Id.*) Brewster also notified Gill of the problems with the machine, but Gill responded that no machine would be taken out of service for maintenance or repair due to high sales volume. (*Id.*) On October 19, 2018, the Line 6 linker machine was "bypassed"[1] and employees were told to "operate the machine in that condition." (*Id.* at 4.)

Brewster also alleges that Burlingame harassed him on a daily basis, including hitting him in the groin, and, on one occasion, putting his thumb into Brewster's throat and choking him until he passed out. (*Id.*) When Brewster would tell Burlingame to stop hitting him, Burlingame responded: "Who are they going to believe? You or a supervisor?" (*Id.*)

On October 26, 2018, Brewster filed a written complaint and reported Burlingame's actions to Swaggerty's human-resources department. (*Id.*) Brewster also reported Burlingame's actions to Doug Swaggerty, the owner, who responded: "The best thing I can tell you is to have your story down to the bullet head." (*Id.*)

On October 27, 2018, another Swaggerty employee lacerated and fractured his finger on the linker machine, leaving blood on the machine. (*Id.*) According to Brewster, the machine was hosed down but no decontamination was performed and meat processing resumed on the machine within minutes of the accident. (*Id.*) After the accident, Brewster returned to the human-resources department and complained about Swaggerty's failure to repair damaged machines and to decontaminate the machine before using it again. (*Id.* at 4–5.) That same day, Swaggerty suspended Burlingame for one week. (*Id.* at 5.)

---

[1] Brewster's complaint does not explain what "bypassed" means as it relates to the condition of that machine.

In late 2018, maintenance employees were asked to give written statements about what they had observed between Brewster and Burlingame. (*Id.*) Other employees confirmed that Burlingame harassed Brewster and his son, who was also an employee at Swaggerty. (*Id.*)

Burlingame returned to work on November 5, 2018. (*Id.*) That same day, Brewster was instructed to report to Gill, not Burlingame. (*Id.*) According to Brewster, in a conversation with Gill in late November 2015, Gill told him: "You are going to hate me and this place before this is all over." (*Id.*) When Brewster responded that he was "only trying to do the right thing," Gill replied: "Take my word, you are going to hate me and this place." (*Id.*)

Brewster also alleges that, when Burlingame returned to work, high-powered rifles and a pistol were visible in his vehicle, despite Swaggerty's policy of not permitting firearms on company property. (*Id.* at 1, 5.) When Brewster complained to human resources about Burlingame's firearms, the company responded by changing the sign in the parking lot to state that firearms are prohibited "unless authorized." (*Id.* at 5.)

On November 12, 2018, Brewster submitted another written complaint about Burlingame. (*Id.*) In his complaint, Brewster noted that: (1) Burlingame ignored safety issues; (2) the Line 6 linker machine was in use despite not being repaired; and (3) Burlingame returned to work with firearms visible in his car. (*Id.*) Brewster also communicated that he had talked to an attorney and that he had "notified a federal government agency" about Swaggerty's "practices." (*Id.*) Around this time, Brewster notes that he was being harassed on a daily basis, including being followed to the bathroom, having his welding helmet filled with grease, and someone hiding his tools. (*Id.*)

On December 2, 2018, Brewster met with Eric Stolen, Swaggerty's human-resources manager, and Lee Harsson, Swaggerty's business-operations manager. (*Id.*) In the meeting,

Stolen and Harsson told Brewster that they had consulted attorneys and were told Burlingame could return to work and that they did not have to provide Brewster "any information on machine safety." (*Id*.) According to Brewster, Stolen and Harsson also asked him to "sign off" on his allegations and "get back to work," but he refused to sign anything. (*Id*. at 7.)

At some unspecified time, Brewster spoke to an "on-site" United States Department of Agriculture ("USDA") inspector to report his concerns about the use of a contaminated machine. (*Id*.) The USDA inspector responded that he was on-site to verify the quality, not the wholesomeness, of Swaggerty's meat products. (*Id*.) The inspector did, however, state that he would talk to people at the USDA about Brewster's concerns. (*Id*.)

On December 7, 2018, Brewster met with Stolen and Harsson, as well as "Chief Operating Officer Amidei" and "Security Manager McGill." (*Id*.) During the meeting, Stolen noted that there were three missing welding helmets. (*Id*.) Brewster responded that "management employee" Wyley Mink gave him permission to store his helmet in his car because someone had put grease in it. (*Id*.) Nonetheless, Swaggerty suspended Brewster for three days. (*Id*.) At the end of the meeting, after taking Brewster's access card, key to the shop, and a gate opener, McGill escorted him off the premises and told him to "just quit." (*Id*. at 7–8.) According to Brewster, that same day, other Swaggerty employees were told that Brewster would not return to work. (*Id*. at 8.)

Brewster subsequently received a letter dated December 14, 2018, from Amidei. (Doc. 1-6.) In the letter, Amidei states that Swaggerty suspended Brewster because video surveillance showed him taking a welding helmet and tools off premises in violation of company policy. (*Id*.) The letter further stated that, when McGill escorted him to his vehicle, Brewster told McGill he had accepted a job at another company and that he was "done with Swaggerty's." (*Id*.) Brewster

4

alleges that this conversation did not happen. (Doc. 1, at 8.) The letter from Amidei concludes that, "[u]pon review of evidence compiled," Swaggerty "has decided to accept your resignation effective December 7, 2018." (Doc. 1-6.)

Brewster initiated the present action on November 25, 2019. (Doc. 1.) Based on the allegations in his complaint, Brewster asserts claims against Swaggerty for: (1) retaliation under the Food Safety Modernization Act ("FMSA"), 21 U.S.C. § 301, *et seq.*; (2) negligent retention; and (3) retaliatory discharge under Tennessee common law. (*Id.* at 8–11.) Swaggerty has filed a motion for partial dismissal of Brewster's claims (Doc. 7), and its motion is now ripe for the Court's review.

## II.     STANDARD OF LAW

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id.* at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859

(6th Cir. 2007). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. ANALYSIS

### A. Violation of FSMA

Swaggerty first argues that the Court should dismiss Brewster's FSMA claim to the extent his complaints about "safety issues" encompass workplace-safety issues and not food-safety issues. (Doc. 8, at 5–6.) In relevant part, FSMA provides:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee . . . because the employee, . . . –
>
> > (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter; [or] . . .

(4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this chapter, or any order, rule, regulation, standard, or ban under this chapter.

21 U.S.C.A. § 399d(a).

In responding to Swaggerty's motion to dismiss, Brewster agrees that workplace safety issues are outside the scope of FSMA and clarifies that his FSMA claim is based solely on his complaints about the use of a meat-processing machine without proper decontamination after an accident that left blood on the machine. Because Brewster has clarified that his FSMA claim is not based on his complaints about workplace safety, partial dismissal is unnecessary. Accordingly, the Court will **DENY AS MOOT** Swaggerty's motion to dismiss Brewster's FSMA claim to the extent it is based on his allegations regarding workplace safety.

### B. Negligent Retention

Swaggerty next argues that the Court should dismiss Brewster's claim for negligent retention of Burlingame because it is barred by the exclusive-remedy provision of the Tennessee Workers' Compensation Act ("TWCA"), Tenn. Code Ann. § 50-6-108(a).

In Tennessee, the TWCA governs injuries "arising out of" and occurring "in the course of" employment. Tenn. Code Ann. § 50-6-101; Tenn. Code Ann. § 50-6-102(14). For injuries arising out of and occurring in the course of employment, an action under the TWCA is the employee's exclusive remedy:

The rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident . . . shall exclude all other rights and remedies of the employee, the employee's personal representative, dependents or next of kin, at common law or otherwise, on account of the injury or death.

Tenn. Code Ann. § 50-6-108(a). Brewster concedes that his negligent-retention claim arises out of his employment with Swaggerty, but argues that the exclusive-remedy provision of the

TWCA is inapplicable because his injuries did not occur in the course and scope of his employment as a maintenance technician. (Doc. 18, at 4–6.)

"[T]he requirement that an injury occur 'in the course of' employment . . . requires an examination of whether the injury occurred 'while the employee was performing a duty he or she was employed to perform.'" *Gooden v. Coors Tech. Ceramic Co.*, 236 S.W.3d 151, 154 (Tenn. 2007) (quoting *Clark v. Nashville Mach. Elevator Co.*, 129 S.W.3d 42, 47 (Tenn. 2004)). To determine whether an injury occurred "in the course of" employment, courts should focus "on the time, place, and circumstances of the injury." *Id*. "Stated differently, an injury occurs in the course of employment 'when it takes place within the period of the employment, at a place where the employee reasonably may be and while the employee is fulfilling work duties or engaged in doing something incidental thereto.'" *Id*. (quoting *Blankenship v. Am. Ordnance Sys., LLS*, 164 S.W.3d 350, 354 (Tenn. 2005)). In further defining these parameters, the Tennessee Supreme Court has held that "a worker who is on the employer's premises coming to or going from the actual work place is acting in the course of employment." *Lollar v. Wal-Mart Stores, Inc.*, 767 S.W.2d 143, 150 (Tenn. 1989). Tennessee courts have further found that workplace assaults and injuries occurring on the employer's premises during breaks or while an employee is "off the clock" occur in the course of employment, even though the employee may not be fulfilling work duties at the time of the injury. *See Gray v. McDonald's Corp.,* No. 2:10-CV-2779-JPM-TMP, 2011 WL 13116678, at *3 (W.D. Tenn. Mar. 14, 2011); *Gooden v. Coors Tech. Ceramic Co.*, 236 S.W.3d 151, 156 (Tenn. 2007); *Holder v. Wilson Sporting Goods Co.*, 723 S.W.2d 104, 108 (Tenn. 1987).

In this case, Brewster's alleged injuries resulting from Swaggerty's alleged negligent retention of Burlingame occurred in the course of his employment because they all took place on

Swaggerty's premises while he was engaged in activities incidental to his employment. In his complaint, Brewster alleges that Burlingame punched him and choked him to the point of passing out at work and that he displayed firearms in his truck parked in the Swaggerty parking lot to intimidate him. (Doc. 1, at 4–6.) These allegations describe a workplace assault and intimidation undertaken by a supervisor on Swaggerty's premises either during work hours or while Brewster was coming to or going from Swaggerty. As a result, Brewster's alleged injuries based on Swaggerty's negligent retention of Burlingame qualify as occurring during the course of his employment. Therefore, the exclusive-remedy provision of the TWCA bars Brewster's claim against Swaggerty for negligent retention of Burlingame.[2] *See, e.g.*, *Bellomy v. Autozone, Inc.*, No. E2009–00351–COA–R3–CV, 2009 WL 4059158, at *11 (Tenn. Ct. App. Nov.24, 2009); *Fonseca v. Golden Living Ctr.-Mountainview*, No. 4:09-CV-93, 2010 WL 3155984, at *6 (E.D. Tenn. Aug. 10, 2010); *Nettles v. Hotel Peabody, G.P.*, No. 2:09-CV-02776-JPM, 2010 WL 5093362, at *5 (W.D. Tenn. Dec. 8, 2010). Accordingly, the Court will **GRANT** Swaggerty's motion to dismiss Brewster's negligent-retention claim.

---

[2] In opposing Swaggerty's motion to dismiss, Brewster also argues that the TWCA does not bar his negligent-retention claim because Swaggerty's actions were intentional. (Doc. 18, at 6.) Intentional torts committed by an employer against an employee are not barred by the exclusivity provision of the TWCA if a plaintiff alleges that the employer actually intended to injure the plaintiff. *See Nettles v. Hotel Peabody, G.P.*, No. 2:09-CV-02776-JPM, 2010 WL 5093362, at *5 (W.D. Tenn. Dec. 8, 2010) (citing *Bellomy v. Autozone, Inc.*, No. E2009–00351–COA–R3–CV, 2009 WL 4059158, at *11 (Tenn. Ct. App. Nov.24, 2009)). Brewster's complaint, however, does not allege that Swaggerty acted intentionally or with the actual intent to injure him. To the contrary, Brewster specifically alleges that Swaggerty "is liable for the harm resulting from its own conduct in negligently or recklessly allowing Burlingame to remain employed . . . . [Swaggerty] was aware, or should have been aware, of Burlingame's unfitness." (Doc. 1, at 10.) Such allegations belie Brewster's assertion that he has alleged Swaggerty engaged in intentional conduct.

## C. Retaliatory Discharge

Finally, Swaggerty argues that the Court should dismiss Brewster's state-law claim for retaliatory discharge because it is preempted or barred by certain state and federal statutes. (Doc. 8, at 8–12.)

Swaggerty first argues that the Clean Water Act's anti-relation provision, 33 U.S.C. § 1367, preempts Brewster's state-law retaliatory discharge claim based on his reporting of Swaggerty's waste dumping in a nearby creek. (Doc. 8, at 9–10.) State laws "may be overridden by conflicting federal laws, both expressly and impliedly. *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 583 (6th Cir. 2013). "Implied preemption has been divided into field preemption, where pervasive federal regulation precludes enforcement of state laws on the same subject," and "conflict preemption, which nullifies state law to the extent that it actually conflicts with federal law." *Id.* (internal citations and quotations omitted). "Recognizing federalism concerns, courts have typically applied a presumption against preemption, especially in fields that the states have traditionally occupied, like health and safety." *Id.* (internal quotations omitted). The party asserting that federal law preempts state law has the burden of demonstrating that preemption applies. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) (noting that "federal preemption is an affirmative defense upon which the defendants bear the burden of proof").

The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, grants the United States Environmental Protection Agency "express rights and responsibilities to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters,' but preserves states' 'primary responsibilities and rights' to abate pollution." *Askins v. Ohio Dep't of Agric.*, 809 F.3d 868, 871

(6th Cir. 2016) (quoting 33 U.S.C. § 1251(a)–(b)). The Clean Water Act includes an anti-retaliation provision, which states:

> No person shall fire, or in any other way discriminate against, or cause to be fired or discriminated against, any employee . . . by reason of the fact that such employee . . . filed, instituted, or caused to be filed or instituted any proceeding under this chapter, . . . .

33 U.S.C.A. § 1367(a). Employees who are retaliated against in violation of this provision are directed to file an administrative complaint with the Secretary of Labor. *Id*. § 1367(b).

In this case, Swaggerty has failed to satisfy its burden of demonstrating that the Clean Water Act preempts Brewster's state-law claim for retaliatory discharge. The Clean Water Act's anti-retaliation provision does not state it is an employee's exclusive remedy, and Swaggerty has not cited any authority suggesting that the Clean Water Act expressly preempts Brewster's retaliatory-discharge claim. Similarly, Swaggerty has not identified any authority suggesting that the Clean Water Act impliedly preempts Brewster's retaliatory-discharge claim because it occupies the field of workplace retaliation lawsuits or because it conflicts with Tennessee's laws. Swaggerty has therefore failed to demonstrate that the Clean Water Act preempts Brewster's retaliatory-discharge claim under Tennessee law. Accordingly, the Court will **DENY** Swaggerty's motion to dismiss Brewster's retaliatory-discharge claim based on his reporting of Swaggerty's waste dumping in a nearby creek.

Swaggerty next argues that Brewster's retaliatory-discharge claim based on his complaints about food safety is preempted by FSMA. FSMA's anti-retaliation statute, however, includes a provision stating that "[n]othing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law." 21 U.S.C. § 399d(c)(1). Swaggerty nonetheless contends that the district court's decision in

*O'Risky v. Mead Johnson Nutrition Co.*, No. 17 C 1046, 2017 WL 3421552 (N.D. Ill. Aug. 8, 2017), supports its argument that FSMA preempts Brewster's retaliatory-discharge claim. The district court in *O'Risky*, however, did not find that FSMA preempted the plaintiff's state-law retaliatory-discharge claims. Rather, the district court found that the plaintiff's state-law retaliatory-discharge claim under Indiana law failed because Indiana did not recognize a whistleblowing exception to its at-will employment doctrine. *Id.* at *4. Neither the text of FSMA nor *O'Risky* suggests that FSMA preempts Brewster's retaliatory-discharge claim, and Swaggerty has not otherwise demonstrated that Tennessee's laws conflict with FSMA. Accordingly, the Court will **DENY** Swaggerty's motion to dismiss Brewster's retaliatory-discharge claim based on his complaints about food safety at Swaggerty.

Swaggerty next argues that the Tennessee Occupational Safety Hazard Act ("TOSHA"), Tenn. Code Ann. 50-3-101 *et seq.*, provides Brewster's exclusive remedy for his retaliatory-discharge claim to the extent it is based on his complaints about employee safety. (Doc. 8, at 10.) In responding to Swaggerty's motion to dismiss, Brewster represents that his retaliatory-discharge claim is not based on complaints about employee safety (Doc. 18, at 10); rather, his retaliatory-discharge claim is based on his complaints about: (1) offering unwholesome or adulterated food and for continuing to operate a meat-processing plant in an unsanitary condition; (2) unlawfully disposing of water containing business waste; and (3) Burlingame's assault and intimidation. (Doc. 1, at 11–12.) Because Brewster has clarified that his retaliatory-discharge claim is not based on his complaints about workplace safety, partial dismissal of that claim is unnecessary. Accordingly, the Court will **DENY AS MOOT** Swaggerty's motion to dismiss Brewster's retaliatory-discharge claim to the extent it is based on his allegations regarding workplace safety.

Finally, Swaggerty argues that the Court should dismiss his retaliatory-discharge claim to the extent it is based on his complaints about Burlingame assaulting him.  (Doc. 8, at 11.) Specifically, Swaggerty argues that such a claim is barred by the TWCA's exclusive-remedy provision.  The Tennessee Court of Appeals, however, has suggested that retaliatory-discharge claims do not fall within the TWCA's exclusive-remedy provision.  *See Leatherwood v. United Parcel Service*, 708 S.W.2d 396, 401 (Tenn. Ct. App. 1985) (holding that a plaintiff's claim for retaliatory discharge based on his filing of a workers' compensation claim was not barred by the exclusive remedy provision in the TWCA).  As a result, even if the TWCA is the exclusive remedy for an underlying injury arising out of and in the course of employment, a retaliatory-discharge claim based on an employee's complaint about a company's violation of public policy does not fall within the exclusive-remedy provision of the TWCA.[3]  Accordingly, the Court will **DENY** Swaggerty's motion to dismiss Brewster's retaliatory-discharge claim to the extent it is based on his complaints about Burlingame assaulting him.

## IV.    CONCLUSION

For the reasons stated herein, Swaggerty's motion to dismiss (Doc. 7) is **GRANTED IN PART** and **DENIED IN PART**.  Brewster's negligent-retention claim is **DISMISSED WITH PREJUDICE**.

---

[3] The elements of a common-law retaliatory discharge claim are:

(1) That an employment at-will relationship existed; (2) That the employee was discharged; (3) That the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional statutory or regulatory provision; and (4) That a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Crews v. Buckman Labs., Int'l, Inc.,* 78 S.W.3d 852, 862 (Tenn. 2002).

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**